Thank you. Please the court. I'm Ernest Reynolds from Fort Worth here today to represent Amanda Abbood, the plaintiff in this case, and here before this court the appellant. I think if the court would permit me I could probably outline in about two or three minutes what I believe the keys to the case are, although I'm happy at any time to try to answer any question. This is a case that was dismissed, or as we would say in state court where I spend most of my time in Texas, dumped on summary judgment, and there are two fundamental problems with what the trial judge did, and I might say I've known him since he was in practice and I think very highly of him personally and professionally, but this time I must respectfully say I do believe he erred. First, I think he applied the wrong standard to summary judgment. I've provided the citation to a Supreme Court case from 2014, the Cotton case, which as I read the case appears to me to be an effort by the Supreme Court at that time to revisit Rule 56, the summary judgment rule, and provide a little bit of corrective guidance to say a summary judgment is not a mini trial, the judge is not a fact finder, let's take a look at Rule 56, and the court should be limited to trying to see whether the burden has been met or is there a fact issue, and I think the court clearly in its opinion followed precedent from this court from the case of Mississippi Protective and Advocacy Services v. Cotton in 1991, and at page three of the opinion, and we've got it in the appendix to our briefing, quoted from that Cotton case, the 1991 case, quote, where the record including affidavits, interrogatories, admissions, and depositions could not as a whole lead a rational trier of fact to find for the moving party there is no issue for trial, but we have also in our brief quoted the pertinent language from the Supreme Court in 2014, and of course we've brought forward the rule, and the rule requires a much more narrow and strict construction of the role of the trial court. I can come back to that, and I've covered it in the brief in detail, but I'd like to move to the second fundamental problem in this case. This is a case where I believe as the summary judgment motion was brought to the trial court, the trial court experienced some confusion, and this is a case involving a woman who says, I have a sexual harassment claim, and then I have a retaliation claim. That's what she says, but for some reason, the trial court spends a lot of time on the McCoy case, which is much, much different. McCoy was a senior employee in a police department. She was black, and she was harassed, but she was not sexually harassed. As I recall the opinion, there was actually a finding there was no adverse action because at some point, she had had enough, and she resigned and retired, but there clearly was conduct in that case that was troublesome. However, it was not a sexual harassment case, and Ms. Abood is not bringing a case of racial discrimination, so there are different issues, and the McCoy case becomes a confusing precedent to try to use as a template for the decision of this case, where part of the reasoning of the trial court is, well, was someone else similarly situated? Was this fellow who was the harasser the comparator? Those are issues that might have been in the McCoy case, but were not in this case. Ultimately, taking a look at the case as it reaches this court, we have said that there was error because we had sufficient evidence, and we brought forward a lot of evidence. We had a detailed affidavit. It was dismissed with the jot of a pen and a phrase about, well, it's too general, or it's inconsequential, and I would respectfully . . . The court was clear that the behavior was despicable that she suffered, yet it didn't fit in any of our hostile work environment case law. The court said that, but if I might explain why I think that's not dispositive, the court looked at this on a truncated statement of facts, essentially borrowing and incorporating the truncated statement of fact that was brought forward by the state of Texas. I love the state of Texas, but I want to see the state of Texas treat everyone fair, and here, the state had abused my client, and then we brought forward a lot of evidence that the trial court simply disregarded, which is something, by the way, that the Supreme Court in the Cotton case from 2014 expressly says can't be done. That case, and it really doesn't make new law . . . The court independently said this employer did react promptly as . . . But we . . . No, they didn't. What the district court did was to accept from the briefing provided to it by the summary judgment movement the proposition that there were two written complaints, one in August and one in December of calendar year 2016, but we brought forth evidence that even at the time when my client was employed in other women, that supervisors knew this, and she became aware that they knew it, that Otts also was harassing Jacqueline Nino, a contemporary employee, and possibly other females, that prior to the written complaint, which was made at the request of the supervisors in August of 2016, there had been numerous complaints made verbally to supervisors. One of the issues brought to the court is, well, the harasser wasn't exactly a harasser. He was sort of a semi-supervisor, but he didn't qualify. She wasn't fired in the end, and yet she made the same complaint. Well, Nino wasn't fired, but Nino was told, and part of the affidavit record shows this, that if she went to the EEOC, she probably would be fired. That's why she didn't go to the EEOC. Is that in the record? Yes, it's in the affidavit, as I recall, Your Honor. It's in the affidavit of my client, which is an appendix to the . . . After your client made a written report, and you can understand why they'd require a written report, after she made the written report, they did promptly move him over to the other side of the building, isn't that true? Yes, but it's not a very big office space, and they didn't stop him from roaming at will and continuing to harass female employees, including my client and Nino. Case law from this court in recent years, which I have summarized, shows that it's not enough. It's not enough to do a little. Once the supervisors become aware, and this court has not required that they be notified in writing, the supervisors have to effectively stop the misconduct, and the supervisors did not effectively stop the misconduct. When they got the next complaint, they did, though, didn't they? No, they did not. They continued to keep this fellow on the rolls until the following year. He was still on the rolls when they disemployed my client. That gets to the question of the pretextual disemployment situation. I've listened with great interest, as all of you have talked to people this morning about contracts and what does the language say. Well, the ruling question, as we've pointed out, says that for someone to be for a first offense for using this data system, they have to get credit information. My client not only didn't get credit information, she was not capable of getting it. Her supervisors, including Ms. Womble, have testified and agreed she didn't get credit information. She did not give the information to anyone. In fact, she wasn't able to access any helpful information while she was trying to find out a phone number. I thought the district court made a finding that everyone that breached the system for private, non-business purposes was fired. Well, if it made that finding, I respectfully submit it's a hard thing for me to understand how it could make that finding when the record is crystal clear and I have testimony from Ms. Womble, the supervisor of Ms. Allen, who is the direct supervisor of my client, that there was no information obtained by my client or given to anyone. But let me ask you this question. Yes, Your Honor. Do you have evidence that there's someone who accessed private information who was then not fired? It's a strange, yes, and it's kind of a strange— Did you? Yes, it's a strange situation, but what I did was I asked these supervisors this question. Is there anyone that you know of who did the very same thing that my client did and got fired for it? The answer was no. There's no one we know of who did the same thing. They're talking about a guy who tried to get personal information about a sitting U.S. president and he was fired. They're talking about a woman who was helping her relatives to get funding through this—it's a program that distributes federal and state funding to people in need who got fired. My client didn't do those things. Nobody got fired for doing what my client did. My client—my client has explained in her evidence— Are you saying nobody ever did what your client did or you have evidence that someone did it and did not get fired? Which one are you saying? We don't know of anyone who did that. We don't know of anyone who got fired for it, but what we do know, Your Honor, is the rule says the only way that taking this information, as a general rule, is a first-time firing offense is if they get credit information. And I have it proven crystal clear from her and from her supervisors that they did not—she didn't get credit information. In fact, she used the standalone system as her mode of access. She couldn't have gotten credit information. But she also—and everyone agrees about this in retrospect—she also did not have information which gave her a file number and so she didn't get any information. So what you're saying is the rule is you can use this server for personal use as long as you don't access credit information. You can get other information about people who are on it. You just can't get their credit information for personal use. The rule is you can't use it for personal use, but unless you get credit information, there's no rule that says it's a first-time firing offense. And there's detailed deposition testimony from the direct supervisor. So the rule is if you use it for personal use, the disciplinary action which is taken is less than termination. Is that— Yes. There's testimony— That's a written rule. There's testimony in the record about how they go through a four-step process. And in fact, that's the significance of putting OTS through the four-step process. It shows they knew how to do it, even though there's a rule, as I understand it, and some of the testimony shows it, there's a rule that if you commit sexual harassment, that might be a first-time firing offense. What happened here was these people got upset with my client. They knew by August of 2016 that because she had been making verbal complaints and others had, and they wouldn't stop this fellow OTS from harassing her, she was getting guidance from EEOC. You're saying OTS was still working there when your client was terminated? That's correct, Your Honor. Did they still work there? No, they fired him for sexual harassment a little bit after they fired my client. But what happened was, and this is in the record, it's in the affidavit, it's clear in the record, Ms. Allen began to harass my client and tell her, you can't go to the EEOC. I'm watching you. You might lose your job, and follow her around the office and make life difficult for her, which was very, very improper. So as I said a few minutes ago, we have two claims, neither of them like the claim in the McCoy case. We have a claim for sexual harassment and plenty of proof much beyond what the trial court considers. And then we have the claim that she was retaliated against. Now, here at page 25 of our brief, I have the quote from the Toland v. Cotton case from the Supreme Court in 2014, and it says, On the retaliation claim. Pardon me? No, go ahead. I'm sorry. It, this, this is on the standard of review under Rule 56, and it says the court can't, the court cannot make findings of fact. It just got to find out whether there's fact or not. It's got to consider all of the evidence. And that just simply didn't happen here. It didn't. And I've analyzed in the brief, issue by issue in Section D, not only the failure to follow that standard, but how the court, in its opinion, makes fact findings, and it makes fact findings on three issues, which are issues then that become important in this case. It concludes that there's no evidence of sexual harassment. It concludes that there's no evidence of hostile work environment. It concludes there's no evidence of retaliatory discharge. Let's say the district, you aren't, you, the case concerned me also because it seemed like throughout the record, there was the suggestion that at the same time as she is enduring the despicable behavior of Otts, she also was complaining that Medicaid fraud was occurring. That is true. And, and, and in fact, the record is developed to show. Right. That would implicate superiors, arguably even more severe, severely, but do you agree that under Title VII, there would be no case as to her reporting and being retaliated for reporting that? I do agree, but that's not what our claim is about. I know it's not what our claim is. Our claim under Title VII is that starting in August, prior to August, they knew she was complaining to the Inspector General. Starting in August of 2016, when they found out that she was seeking guidance from the EEOC, then she was retaliated against specifically, explicitly for that, and that retaliation continued until they found a pretext to fire her. And the pretext was to take a rule. That's why I say I've been listening with interest as you talked about language and contracts, to take a rule and just kind of modify and stretch it and misapply it. No one can use this data if you get it. She didn't even get any of it, as it turned out, for personal use. But unless it's credit information, and everyone agrees she did not access credit information, she did not get it, she did not even use an avenue of access that could have gotten it, unless it's credit information, it's not a firing offense the first time. What happened to this woman was that she was, and she wasn't the only one there, but she was harassed by a beast in the office in a way that's uncivil and shouldn't be permitted and definitely shouldn't be permitted in a state or federal office and wouldn't be permitted in a federal office and I think wouldn't be permitted in most state offices. But in this particular one, it was permitted. And then when she was going to EEOC, they were unhappy about that. And then when they had a chance to pounce with a pretext because of this incident, trying to get information when the dog was chained out at the EEOC, they cooked that up into more than it was, sent her two letters in early February and did not give her the chance to go through the four-step process and just fired her. And that's what happened. So she suffered an adverse employment action. And we respectfully submit to this court that there is sufficient evidence, and we've detailed it in sections of our brief, especially sections five, B, C, and D, to show that there was evidence on these points. We've got a section on the standards. I don't know if you've noticed your time has expired. I'll give you a moment. Let me just close by saying we've given the court in our brief separate sections on law, recent good law from this court on these fact issues, on retaliation and on harassment. And we believe that there is sufficient evidence to meet the burden to permit the client to have her day in court to present her case. All right. You've reserved some time for rebuttal. ROLA DABOWLE. Pardon. Thank you very much. ZIXTA Q. MARTINEZ. May it please the Court. THE COURT. May it proceed. ZIXTA Q. MARTINEZ. Rola Dabowle on behalf of Texas Health and Human Services Commission. First and foremost, opposing counsel made a lot of conclusory allegations, but analysis of the record will show there is no evidence to support any of the appellant's claims. This court must affirm the district court's dismissal of appellant's retaliation, gender discrimination, and hostile work environment claims under clearly established Supreme Court and Fifth Circuit precedent. The appellant was terminated for a legitimate non-discriminatory and non-retaliatory business reason after she admitted to accessing HHSC's Data Broker database, which contains highly sensitive and confidential client information, to look up a phone number on a dog's tag that she found during oral— THE COURT. Categorically, what kind of information is— ZIXTA Q. MARTINEZ. This is—so this database is specifically used only to obtain medical eligibility—Medicaid eligibility status with respect to clients who come in to HHSC. The Data Broker Computer Security Agreement specifies that use for any— THE COURT. What kind of information is contained in there? ZIXTA Q. MARTINEZ. So this is like personal social security— THE COURT. Medical records. ZIXTA Q. MARTINEZ. Highly confidential and sensitive information pertaining to these Medicaid clients and their Medicaid eligibility. THE COURT. If you're putting in a phone number to find a dog's owner, you are right immediately into where all the sensitive information is. Is it not layered? ZIXTA Q. MARTINEZ. I am not personally familiar with the way that the database works, but the Computer Security Agreement, which the appellant signed and which is signed by anybody at HHSC who is given access to this database, provides that you may only access the database in order to obtain information regarding the Medicaid eligibility— THE COURT. The overall picture that's concerning, you know, especially at a dismissal stage, is I don't think it's disputed she was an excellent employee. I don't remember—how many years did she work for this employer? ZIXTA Q. MARTINEZ. She worked for the employer for quite some time. THE COURT. A long-time excellent employee, undisputed that she enters the database because she's trying to find the owner for a chain dog. ZIXTA Q. MARTINEZ. Correct. THE COURT. And fire. ZIXTA Q. MARTINEZ. Correct. THE COURT. At the same time, it's not disputed and no one's defending the conduct of the harasser—despicable, egregious—but he doesn't get fired until after she is. ZIXTA Q. MARTINEZ. I don't necessarily agree with that. The HHSC actually took prompt remedial action as soon as it heard of her complaints. As soon as she made her complaints, HHSC, per its work rules and policies, took prompt remedial action in order to discipline Ott. THE COURT. That's what she's asking for. She's saying, I wish they'd taken prompt dismissal. I made a mistake. It was winner, chain dog. I got on. They gave me no discipline at all. Been there forever. And lo and behold, I am complaining about a harasser who does end up getting fired because he's a harasser. And I'm also saying, gosh, this is taxpayer money and it's being spent too easily. We're not meeting the eligibility requirements. So that would get people apprehensive. This is a woman who's trying to hold us to high standards. There's no—none of the claims can go forward on that? ZIXTA Q. MARTINEZ. I don't believe any of her claims go forward, Your Honor. The appellant was aware that there is a strict policy in place. And you can find the policy at ROA 420 to 421, and that— THE COURT. And the response factually is when he deposed people in the company, they said, well, we never fired anyone who did what she did? Is that a problem? ZIXTA Q. MARTINEZ. No, the response is this is strictly prohibited with respect to any employee at HHSC, and there's no evidence in the record showing that anybody who accessed the database for purposes other than obtaining client medical eligibility status was not terminated. They have simply not put forth any evidence showing that— THE COURT. He made the reference it was a little bit obtuse, but what do you think he was referring to? ZIXTA Q. MARTINEZ. He is trying to say that there's nobody who has gone and looked up a number of a dog tag and put it in the database and hasn't—and has been terminated as his client has. But the case is, and the appellant was well aware of this, it is strictly prohibited. This is a very strict liability standard with respect to HHSC. It's a strict policy. If you access the database for purposes other than obtaining a client's Medicaid eligibility status, no matter what it is, you face disciplinary action up to and including dismissal, and there's no evidence in the record showing that anybody had anything less than dismissal with respect to accessing this database for personal use or purposes other than obtaining client Medicaid eligibility status. THE COURT. Counsel's argument is that the rule has a four-point program that you—they follow, and that the rule only makes it a firing offense if you access financial or medical information. ZIXTA Q. MARTINEZ. Counsel may have said that, but the record and the evidence simply does not reflect— THE COURT. ZIXTA Q. MARTINEZ. —the four-point rule. If anything, the evidence shows that— THE COURT. Is the rule in the record? ZIXTA Q. MARTINEZ. The computer security agreement is in the record, and it's at ROA 420 to 421, and that is the agreement that the appellant signed, which is signed by anybody at HHSC with access to this database, that says that inappropriate use of data broker information is a work rule violation and will result in disciplinary action up to and including dismissal. And like I said, there's no evidence in the record or anywhere else that any sort of disciplinary action less than dismissal has been given by HHSC for violation of this— THE COURT. At the end of your brief, you say, oh, we know it wasn't pretext, use of this rule,  ZIXTA Q. MARTINEZ. That— THE COURT. Did she actually make a complaint to EEOC or not? ZIXTA Q. MARTINEZ. I am not sure if Ms. Nino made a complaint to EEOC. I know that Ms. Nino made the exact same internal complaints within HHSC and made— THE COURT. Not a comparator, then, for the claim that this was a retaliation for going all the way to EEOC. ZIXTA Q. MARTINEZ. I'm not sure that they specifically say that this is in retaliation for going all the way to EEOC, but there is no evidence that there has been any— THE COURT. Ms. Abood said, oh, well, Nino wanted to complain the way I did, but there was—she was told you can't take time off to do that. ZIXTA Q. MARTINEZ. With respect to any affidavit submitted by Ms. Abood, everything in her affidavit was conclusory, and we moved to strike her affidavit based on the fact that there was no evidentiary support for anything that was said. The record evidence shows that there is absolutely no evidence of any retaliation or discriminatory animus with respect to the actions that were taken. THE COURT. But her statement is extraordinarily detailed in terms of especially the harassment she suffered, which the district court seemed to have credited. ZIXTA Q. MARTINEZ. Yes, and— THE COURT. So I don't see it as conclusory, but this is an important point to me, because in your brief, you said, well, these were, quote, comments about her figure and clothing. And you said, Otts never used inappropriate language. That seems like quite a tortured description. Would you—is your position that Otts never used inappropriate language? ZIXTA Q. MARTINEZ. So it's not my position, and our position is actually that we concede that his conduct was wholly inappropriate. THE COURT. But I'm just—again, in your brief, you represented to us, it was comments about her figure and clothing. But in fact, she said, he told her, I want to jump your bones, give him a call. That's far beyond figure and clothing. ZIXTA Q. MARTINEZ. Yes, I agree, Your Honor. But also, the appellant contradicts herself in several ways. So she gave testimony in her deposition that Otts never made any explicit comments to her, never used vulgar, inappropriate, or profane language, never propositioned her for sexual favors, and never touched her. And that's at ROA 392 at page 122, lines 20 through page 123, line 11. It's also at page 124, lines 21 through page 1259. And I can go on. THE COURT. You're saying her fuller description that you're saying you moved to strike undercuts other statements she attributed to him? ZIXTA Q. MARTINEZ. I'm saying that the appellant's testimony regarding what Otts did under oath contradicts what she said in her conclusory affidavit. Regardless, what it comes down to, Your Honors, for purposes of is that the Supreme Court has established in Farragher v. City of Boca Raton, which is 524 U.S. 775 at 778, that offhand comments and isolated incidents such as those in this case will not amount to discriminatory changes in the terms and conditions of employment. Moreover, the Supreme Court in Vance v. Ball State University, which is 570 U.S. 421, teaches that HHSE can only be held liable for a hostile work environment claim when its negligence leads to the creation or continuation of a hostile work environment. In other words— THE COURT. You said this went on a long time and was continuous. ZIXTA Q. MARTINEZ. There is no evidence of that, Your Honor.  Oh, and that you got to accept? ZIXTA Q. MARTINEZ. What you said is part of the record. ZIXTA Q. MARTINEZ. What we have to look at, Your Honor, is the evidence in the record. She is only— THE COURT. When he was confronted, he didn't deny it. He said he just thought he was joking. ZIXTA Q. MARTINEZ. Right. And we're not saying that what happened did not happen. We've never said that. And actually, HHSE took prompt remedial action in order to protect the appellant and to put a stop to the conduct that was occurring. So first and foremost, she made her first complaint—she only made two complaints in total. Her first complaint was in August of 2016. Immediately after she made her first complaint, HHSC, in accordance with its work rules and policies, immediately disciplined Otts, removed him to the opposite side of the building, told him to limit any interactions that he had with the appellant, and reassigned him to a completely separate unit. There were no incidents after that. Otts was on leave for two months afterwards. And it wasn't until December of 2016, which is four months later, that appellant made her second complaint. An appellant testified under oath that there were no incidences in that four-month period between when HHSC disciplined him in August— THE COURT. The second complaint is still before your alleged breach, right? So she didn't complain pretextually because she thought she was in trouble, or am I wrong that the timeline is the second complaint is only after she knows she's in trouble because of the computer breach? Which is it? Is the second complaint before there's any issue implicating her in employment confidence? I am not 100 percent clear on where the second complaint fell with respect to her breach of the data broker database, but the two are completely unrelated. So the second complaint—I mean, there's no causal connection between her termination and breach of the data broker security agreement and her second complaint that was filed in December of 2016. Well, didn't the agency say they terminated her for just that very reason? She accessed the database for personal reasons? That's correct, but that's separate and apart from the complaint that she made against Otts. After the second complaint was made in December of 2016, HHSC immediately, per its work rules and policies, terminated Otts, changed the locks on the buildings, and removed him from the building. So, I mean— Right after the second complaint? Right after the second complaint. Before she was fired? So before she was fired. That's opposite to what he said. Right, and there's no evidence in the record showing that he wasn't fired at that particular moment. But you're saying Otts was fired— That's correct. She was fired later, and he's saying she was fired. Okay. There is absolutely no evidence of any causal connection between her termination and her alleged complaints. Ms. Nino is a comparator in this circumstance. Ms. Nino made the same exact complaints that she did, at the same exact times, against the same exact harasser. Ms. Nino— The record was not clear on that, that she gets to EEOC and really causes trouble for the employer. I thought Ms. Nino never got there because she was intimidated from going there. At least, that's the allegation. That's the allegation, but there's no evidence of intimidation. The only difference here between Ms. Nino— Mr. Sabud's declaration was that the boss—I forget her name—went to Ms. Nino and said, you're not going to get time off to go. That's her detailed— Right, but there's nothing supporting that. It's a conclusory allegation, and it's hearsay. So, if you look at the evidence in the record, you can see that the only difference between Ms. Sabud and Ms. Nino is that Ms. Nino did not violate the computer security agreement, whereas Ms. Sabud did. Ms. Nino is still employed by HHSC. Ms. Sabud isn't. Ms. Nino filed the exact same complaints that Ms. Sabud did against Mr. Ott, but has not— The supervisor who is alleged to have said, it isn't like this is her money in all caps. I don't know who that supervisor is. Honestly, there's no evidence in the record that supports the conclusory allegations that Ms. Sabud makes in her affidavits. Well, what's conclusory about that? I think that's pretty specific. Well, there's nothing corroborating it. But that doesn't make it conclusory. Your Honors, moving back to Vance v. Ball State University, it teaches that HHSC can only be held liable for a hostile work environment claim when its negligence leads to the creation or continuation of the hostile work environment. In other words, the appellant can only bring a hostile work environment claim against HHSC if there's evidence that HHSC's negligence caused Ott's sexual harassment of the appellant. And there's no evidence in the record showing that HHSC caused or in any way contributed to Ott's alleged conduct. In fact, the record evidence shows that in accordance with its work rules and policies, it took prompt remedial action to protect the appellant after receiving appellant's first and second complaints. Such remedial actions were reasonably calculated to put a stop to Ott's conduct and did put a stop to his conduct. You don't know the timing of the EEOC report with respect to either the access to the file or firing? Honestly, Your Honor, there is no causal, there's no evidence in the record showing that there's... You know the timing. I do not personally know the timing, no, Your Honor. But there is no evidence in the record showing any causal connection between her alleged complaints and the termination of her employment, nor is there any evidence of pretext in the record. Other than, you know, counsel's conclusory statements, there's nothing in the record on appeal that supports her termination because of her complaints. And addressing some of the arguments that counsel... You know, sometimes you look at the time of how close... That's correct, but even though... How close the time was the protected action to the firing. That's correct. But even though there may be some sort of presumption of timing and as being an indicator of retaliation, we have put forth evidence rebutting that presumption, if any exists. Therefore, it turns to the appellant to put forth evidence showing pretext, which she has not done in this case. With respect to counsel's argument that the wrong summary judgment standard was applied here, there's... First and foremost, they failed to raise such arguments in the district court. They didn't file a motion for reconsideration or otherwise raise it. Therefore, it's been waived. Even if it wasn't waived, the court correctly cited the correct summary judgment standard, and there's no evidence showing that they applied the wrong standard when conducting their analysis. Moreover, there's no evidence in the record showing that the court adhered to a, quote, the district's order to stand independently on the fact that the employer took prompt remedial action, that footnote, because it's sort of hard to, it's a, we don't need to, I don't need to reach this, but then it goes on. I do not. I think it, I think there are several bases upon which it, uh, it focused its attention. So there, that is one basis upon which to affirm. Another basis is that, uh, the appellant was unable to meet the objective, uh, standard to show severe or pervasive conduct with respect to the conduct that oughts displayed. Um... So you think the footnote parenthetical is enough to make that as a separate ground, independent ground? Can you repeat that? You think the district court's footnote observation, starting with we don't need to decide this, actually then did independently decide on the basis of the employer's prompt reaction, remedial action? I think that it, it decided on multiple grounds, that being one of them. Unless there are any other questions? Thank you, Your Honor. Thank you, counsel. Rebuttal. Thank you. I'm most appreciative, and I'll try to hit as many points as I can as quickly as possible. I would first like to... Can you talk up a little? Yes, I apologize. I would first like to point out respectfully that counsel has not been at any of the depositions. A very capable lawyer by the name of Mr. Varela was handling the trial work. I have been at them. I know what the record is. And I know that counsel is confused when she says that I've misrepresented the record. Well, hit off the quick fact points that you think exist. Hit them off. For example, she says that the case law says the employer can be liable for being negligent and failing. I don't, personally, I don't want the case law. But I want... Misrepresentation. I want to tell you what the facts are. Tell us those because your time's ticking. The affidavit of Abood shows clearly, and it's not conclusory, it's factual knowledge she has, how many times, how long she was harassed, the kind of harassment, the hostility of the work environment it created for her, and shows that for months she was making verbal complaints before August of 2016. And shows that between August of 2016 and December of 2016, she made more verbal complaints. This fellow was not on leave that whole time. But nothing was done. There is a statement in the record, and I've got it quoted somewhere in the brief from Ms. Womble, who is the supervisor of Ms. Allen, the direct supervisor of my client, where she admits, well, we gave him kind of a counseling, but that's all we did. We didn't do anything else. They didn't check to make sure he stayed at his desk at a different place. I know for a fact that the record shows, and I believe it's in the affidavit of my client, when she was fired, the harasser was still at work. Judge Higginson, you asked the question about what happened in December. Are they complaining that she was supposedly in fear for her job when she made the second complaint? My recollection is she made the second complaint early in December. Then on 15 December, we had the dog incident. That's what I thought. And then they're claiming... Speeding you up, second point. What about Ms. Nino? Is she a comparator or not? No, she's not a comparator. She's not a comparator. There's no actual comparator here, but we don't need one for sexual harassment. Did she get to EEOC or not? She did not. In your mind, that explains the difference. Yes, and that's in the affidavit of my client. It's mentioned. We were afraid to mention it too much for fear that they'd come back and fire Ms. Nino. We know that because this is outside the record, but we had an actual hearing before the employment commission. I'm going to interrupt you there. Especially in Roboto, don't go outside the record. Let's stick to the corrections of fact you wanted to make as to her order. I also want to point out for you, I know time is at a premium for you, not only here, but in your work every day. But at pages 27 and 30, I've got standard of review case law discussed from this court. And one is on workplace sexual harassment, and one is on retaliation. And I respectfully would say, it shows this court has held sometimes just one remark can be enough. That's the Qualar case. This court has held that you don't have to have touching. You don't have to have a gross direct proposition about, let me do something to you type of thing. The state raises these as red herrings. The standard is not as they say it is. I also want to point out to you. His worst comment, would it be give me a call? No. Well, there's a bunch of it in there. And I'm, I'm reluctant. It's in the affidavit. I'm reluctant to say it here on something that's being recorded and will be played out. But it's the guy was a monster. And he did terrible things and said terrible things. And the supervisors were made aware of it, not twice as the state contends, but many times over a long period of time. And the state didn't stop it. They didn't stop it. And the state has conceded just a few minutes ago. Their duty was to stop it, but they didn't. So the harassment claim is separate from the retaliation claim. The harassment is proven. Your time has expired. I'll give you a moment to conclude. And on retaliation, we have shown conclusively, and it's in our brief here. And we've got quotes from Ms. Womble in her testimony in this part of the brief in sections 5C and D. What happened here was nobody else ever got fired for this same thing. And this was not a firing offense. The client didn't get any information. I do know, unlike counsel for the state from being at the depositions, from the freestanding approach device, even if information had been obtained, it wouldn't have been the kind that was prohibited, which is credit information only for a firing offense the first time. Thank you, Mr. Reynolds. Thank you all. Matter under advisement, and we are adjourned. And my client has